## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                    No. 17-CR-3246-MV-6

KERON LUCIOUS,

       Defendant.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Defendant Keron Lucious' Objections to Revised PSR and Supplemental Sentencing Memorandum. Doc. 520. The Court held a sentencing hearing on January 26, 2022. Doc. 513. At that hearing, the Court addressed Mr. Lucious' objections, accepted Mr. Lucious' Amended Plea Agreement and sentenced him to a term of imprisonment of 60 months, followed by a five-year period of supervised release. In this Memorandum Opinion and Order, the Court will provide further context for its decision.

### BACKGROUND

On August 19, 2021, Mr. Lucious pled guilty to Count 1 of a one-count Superseding Information charging him with Conspiracy to Commit Sex Trafficking, in violation of 18 U.S.C. § 1594(c). Doc. 418; Doc. 415. His Amended Plea Agreement recommends a sentencing range of five years to twelve years imprisonment under Federal Rule of Criminal Procedure 11(c)(1)(C). Doc. 418 at ¶ 11. The Court will accept the plea agreement; therefore, the agreement's recommended sentencing range is binding. Fed. R. Crim. P. 11(c)(1)(C).

Mr. Lucious raised two objections which the Court addressed at his sentencing hearing. *See generally* Doc. 520. First, Mr. Lucious objected to a two-level "vulnerable victim"

enhancement assessed under U.S.S.G. § 3A1.1(b)(1).  Doc. 520 at 1–6.  His objection was granted.

Therefore, Mr. Lucious' total offense level was revised from 33 to 31.  Mr. Lucious is in criminal

history category I; therefore, his final advisory guideline sentencing range is 108 to 135 months.

Second, Mr. Lucious objected that submitting to a sex offender assessment while on

supervised release was unnecessary.  Doc. 520 at 6–7.  His objection was denied; however, the

Court granted his request in the alternative that the assessment and all supporting testing or

documentation would be provided to defense counsel.  *Id*. at 7.

Having accepted the plea agreement and addressed Mr. Lucious' objections, the Court

sentenced Mr. Lucious to a term of imprisonment of 60 months, followed by a five-year period of

supervised release.  At the time he was sentenced, Mr. Lucious had been in custody for 1,387 days.

Doc. 490-1 at 1.

## DISCUSSION

### I.    Objections

#### A. Objection to the Vulnerable Victim Enhancement Under U.S.S.G. § 3A1.1(b)(1)

First, Mr. Lucious objected to a two-level "vulnerable victim" enhancement assessed under

U.S.S.G. § 3A1.1(b)(1).  He argues that "[Jane Doe 1] was not a vulnerable victim, and if she was,

Lucious did not know nor had reason to have known that she was vulnerable," citing his "limited

contact" with Jane Doe 1 during the course of the offense.  Doc. 520 at 1, 5.  The United States

responded by arguing that multiple factors rendered Jane Doe 1 a vulnerable victim, specifically

the fact that she had "no home, and no parents to look out for her wellbeing," as well as the fact

that she "used alcohol and marijuana on a regular basis" and was "reported to have been a user

[of] cocaine, ecstasy, and codeine."  Doc. 522 at 5.  "Certainly," the government writes, "Langton

and Perkins knew that Jane Doe 1 was a vulnerable victim . . . . Due to the nature of the conspiracy,

the defendant should have known this as well.  He is liable for what is a reasonably foreseeable consequence of the conspiracy." *Id*.  Probation agreed with the government:

> The following enhancement was not applied simply because [Jane Doe 1] was a minor.  Instead, [Jane Doe 1] was especially vulnerable for reasons other than age—including that [Jane Doe 1] was particularly susceptible to the criminal conduct given her lack of a stable home, being a runaway and she was without parental or other appropriate guidance, which made her unusually vulnerable.  Therefore, the enhancement will remain unchanged.

Doc. 521 at 2.

Section 3A1.1 states that "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels."  U.S.S.G. § 3A1.1(b)(1).  Commentary instructs that a "vulnerable victim" is someone who is "unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 cmt. n.2.  Further, the Commentary instructs that the enhancement should only apply to offenses "in which the defendant knows or should have known of the victim's unusual vulnerability. The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim." *Id.*

"'[V]ulnerable victims' are those who are in need of greater societal protection." *United States v. Brunson*, 54 F.3d 673, 676 (10th Cir. 1995).  "Specifically, the enhancement should apply when the victim is 'less able to resist than the typical victim.'" *United States v. Scott*, 529 F.3d 1290, 1300 (10th Cir. 2008) (quoting *United States v. Castaneda,* 239 F.3d 978, 980 (9th Cir. 2001)).  "Moreover, the vulnerable victim enhancement cannot be based solely on the victim's membership in a certain class; the sentencing court is required to make particularized findings of vulnerability, focusing on the individual victim and not the class of persons to which the victim belonged." *United States v. Smith*, 133 F.3d 737, 749 (10th Cir. 1997).  "[T]he evidence must also

distinguish the victim as atypical of the usual targets of the relevant criminal conduct." *United States v. Caballero*, 277 F.3d 1235, 1251 (10th Cir. 2002).

Notably, if a victim's age has already been taken into account under the relevant offense guideline, it cannot be the basis for the vulnerable victim enhancement. *Scott*, 529 F.3d at 1301. In this case, both Mr. Lucious and the government agree that this Court should not consider Jane Doe 1's age when deciding whether to impose the vulnerable victim enhancement. Doc. 520 at 2; Doc. 522 at 5.

In *United States v. Scott*, the Tenth Circuit considered whether to apply the vulnerable victim enhancement in a case involving the transportation of a minor across state lines with intent to engage in criminal sexual activity. *Scott*, 529 F.3d at 1293. The district court had found that the victim, S.H., was unusually vulnerable to sex trafficking because she was "exceedingly petite" and "naïve," as well as an intravenous methamphetamine user with mental health problems; in addition, she had run away from home. *Id.* at 1301. Evaluating this justification, the Tenth Circuit held that "an unstable personal life is sufficiently common among Mann Act victims that S.H.'s runaway status cannot support the enhancement." *Id.* It also held that the defendant did not know or could not have reasonably known about other vulnerabilities, including her methamphetamine use and mental illness. *Id.* at 1302. However, the Tenth Circuit ultimately upheld the enhancement, concluding that "S.H.'s small physical size and her naivete rendered her unusually vulnerable to trafficking, compared to the average 12–to–16–year–old victim of such a crime." *Id.* at 1302–03.

The Tenth Circuit has not discussed whether the enhancement can be premised upon poverty, drug use, homelessness, and/or lack of parental supervision as related to a minor sex trafficking victim. As the government notes, other circuits have applied the enhancement based

on these characteristics.  *See United States v. Royal*, 442 F. App'x 794, 798 (4th Cir. 2011) (drug dependence vulnerability, homelessness, and lack of contact with family); *United States v. Irving*, 554 F.3d 64 (2d Cir. 2009) (homelessness and lack of parental supervision); *United States v. Jimenez-Calderon*, 183 F. App'x 274 (3d Cir. 2006) (victims who "were young, uneducated, naive and from extremely impoverished families").

Similarly, there is little in-circuit guidance instructing district courts on how to determine whether a defendant "should have known" about a victim's vulnerabilities.  In *Scott*, the Tenth Circuit reasoned as follows:

> Regarding S.H.'s methamphetamine use, the district court found that Scott was aware that S.H. used "illegal drugs," but the evidence shows only that he knew she used marijuana and alcohol . . . . [T]here is no indication in the record that Scott knew or should have known that S.H. used methamphetamine.  Similarly, there is no suggestion that Scott knew of S.H.'s mental problems . . . . Nor does evidence in the record suggest that Scott had any other reason to doubt her mental state, including any notice of her habit of self-mutilation . . . .  It may well be that during the course of Scott's subsequent employment of S.H., he became aware of her drug usage or her mental illness. But the law requires that he hold this knowledge at the time that he placed S.H. in his car and transported her across state lines, the offense for which he was convicted.

*Scott*, 529 F.3d at 1302.  This analysis suggests that, in evaluating what a defendant "should have known," courts should pay close attention to information that defendant observed or was told during the offense, as opposed to relying on knowledge gained after the offense.  So, too, does this analysis suggest that courts should refrain from making large analytic leaps: for example, even if a defendant knew that a victim used "illegal drugs," a court should not conclude that a defendant should have known about a victim's active methamphetamine addiction if he did not witness methamphetamine use.

The Tenth Circuit is clear: neither Jane Doe 1's runaway status nor her age can serve as a basis for applying the enhancement.  Nor will the Court apply the enhancement based on Jane Doe

1's homelessness or lack of parental supervision.  These characteristics are common to the class of minor sex trafficking victims; in Jane Doe 1's case, they are not characteristics "atypical of the usual targets of the relevant criminal conduct."  *Caballero*, 277 F.3d at 1251.  In addition, homelessness and lack of parental supervision are so tied up in the concept of being a "runaway" with an "unstable personal life" that *Scott* precludes the application of the enhancement based upon these characteristics.  *Scott*, 529 F.3d at 1301.

Nor can the enhancement be premised upon Jane Doe 1's alleged drug use.  Even assuming that such use is atypical among minor sex trafficking victims, the Court does not have enough evidence to conclude that Mr. Lucious knew or should have known about Jane Doe 1's drug use. None of the social media exchanges involving Mr. Lucious discuss such drug use; nor has the government established that Mr. Lucious witnessed Jane Doe 1's use or was informed of it.[1] Without additional evidence, the Court cannot conclude that a preponderance of the evidence supports the enhancement.  *See United States v. Kirk*, 894 F.2d 1162, 1164 (10th Cir. 1990). Therefore, Mr. Lucious's first objection was **GRANTED.**  The two-level "vulnerable victim" enhancement does not apply.

**B.  Objection to a Sex Offender Assessment as a Condition of Supervised Release**

Mr. Lucious also objected to one of Probation's recommended conditions of supervised release: that Mr. Lucious complete a "sex-offense-specific assessment to determine the level of risk for sexual dangerousness, recidivism, and amenability to treatment and formulate treatment recommendations if treatment is necessary."  Doc. 494-1 at 1.  Mr. Lucious objects that the sex offender assessment is unnecessary because he "did not have sexual contact of any sort with a

---

[1] In fact, the Court has very little information about the extent of Jane Doe 1's drug use, particularly whether she was an addict or a casual user.  Such information is important: an addict may participate in sex work to fund an addiction or to maintain access to drugs, while a casual user would not be similarly vulnerable.

minor, or any other victim of the venture," and because he has "no history of any criminal conduct

directed towards a minor." Doc. 520 at 6–7.

The government did not respond to Mr. Lucious' second objection. *See generally* Doc.

522. Probation responded as follows:

> The sex offense-specific assessment is necessary to assess a defendant's risk for
> reoffending and current amenability for treatment; guide and direct specific
> recommendations for the defendant's conditions of treatment and supervision;
> provide information that will help to identify the optimal setting, intensity of
> intervention, and level of supervision; and assess the potential dangerousness of the
> defendant. This condition also serves the statutory sentencing purposes of public
> protection and rehabilitation under 18 U.S.C. § 3553(a)(2)(C)–(D). This condition
> enables the probation officer to satisfy the statutory requirements to keep informed
> as to the conduct and condition of the defendant; report the defendant's conduct
> and condition to the sentencing court; and aid the defendant and bring about
> improvements in his conduct and condition. Therefore, the recommendation for a
> sex offense-specific assessment will remain unchanged.

Doc. 521 at 2.

In imposing a condition of supervised release, this Court is guided by 18 U.S.C. § 3583,

which provides that district courts may order non-standard conditions of supervised release "to the

extent that" the condition is:

> (1) . . . reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B),
> (a)(2)(C), and (a)(2)(D);
>
> (2) involves no greater deprivation of liberty than is reasonably necessary for the
> purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and
>
> (3) is consistent with any pertinent policy statements issued by the Sentencing
> Commission pursuant to 28 U.S.C. 994(a).

18 U.S.C. § 3583(d). The "pertinent policy statement" here is U.S.S.G. § 5D1.3(b), which

closely mimics the language of the statute. The Tenth Circuit has held that:

> The special conditions imposed "must be reasonably related to *at least one* of the
> following: the nature and circumstances of the offense, the defendant's history and
> characteristics, the deterrence of criminal conduct, the protection of the public from

further crimes of the defendant, and the defendant's educational, vocational, medical, or other correctional needs."

*United States v. Francis*, 891 F.3d 888, 898 (10th Cir. 2018) (emphasis added) (quoting *United States v. Mike*, 632 F.3d 686, 692 (10th Cir. 2011)). "A sentencing court need not provide reasons for each specific special condition that it imposes; rather, it must only provide a generalized statement of its reasoning." *Mike*, 632 F.3d at 693. Generally, a district court "enjoys broad discretion in setting a condition of supervised release." *United States v. Erwin*, 299 F.3d 1230, 1232 (10th Cir. 2002).

The condition that Mr. Lucious receive a sex offender assessment is reasonably related to the nature of his offense and the need to protect the public from further crimes. Here, Mr. Lucious' offense conduct involved actively trying to become the "pimp" for Breeauna Langton and Jane Doe 1. *See* Doc. 520 at 8 (Mr. Lucious identified himself as a "pimp" when he first messaged Ms. Langton); Doc. 490-1 at ¶ 24 (Ms. Langton tells Mr. Lucious "I'll work for you"); Doc. 522 at 3–4 (Jane Doe 1 told law enforcement that Mr. Lucious had "tried to get her to work for him, but it never happened"). Mr. Lucious went so far as to line up dates for Ms. Langton. Doc. 490-1 at ¶ 22. Furthermore, the Facebook messages imply that Mr. Lucious arranged to profit from the sex work. *See, e.g.*, Doc. 490-1 at ¶¶ 24 (Mr. Lucious telling Ms. Langton "we need half of that if we doing this as a team," "U keep 40 and put 40 on the table," and "after this u have to stat going half"), 26 (Mr. Lucious tells Mr. Perkins "She got my money."). In sum, Mr. Lucious' offense conduct indicates knowledge of how to operate as a "pimp." A condition requiring Mr. Lucious to submit to a sex offender assessment will allow the Court to address the risk that he might return to this lifestyle upon his release.

Just as the term "sex offender" does not refer only to those who are attracted to minors, sex offender assessments are not designed to evaluate only those who are attracted to minors. *See* 42

U.S.C. § 16911 (defining a "sex offender" as "a person who has been convicted of a sex offense"); *see also* Administrative Office of the United States Courts, *Overview of Probation and Supervised Release Conditions*, 83 (Nov. 2016), https://www.uscourts.gov/services-forms/overview-probation-supervised-release-conditions (indicating that the purpose of sex offender assessments is to "help those who have committed sex offenses accept responsibility for sexually deviant thoughts and behavior; develop an increased level of recognition and focus on details of actual sexual behavior; and recognize the arousal patterns, fantasies, planning, and rationalizations of their sexually deviant thoughts and behavior"). In addition to the clinical judgment of qualified evaluators, sex offense assessments often draw upon empirical instruments to determine a given offender's risk of recidivism. *See* Andrew J. Harris, *Risk Assessment and Sex Offender Community Supervision: A Context-Specific Framework*, 70 Fed. Probation 36, 38–39 (Sept. 2006). There are over 20 empirical instruments which a sex offender assessment may use to evaluate a person's risk of recidivism, and attraction to minors is just one predictive variable in those models, along with factors like age, number of prior offenses, marital status, and prior treatment outcomes. *Id.* at 37. In this context, the Court is justified in ordering a sex offense assessment for Mr. Lucious.

The assessment's purpose is to provide the Court and the Probation Office with the information necessary to effectively supervise Mr. Lucious. For example, if the sex offender assessment determines that Mr. Lucious is not in need of sex-offense-related treatment, Mr. Lucious will not be required to attend such treatment. This "stepped approach" is designed to ensure that Mr. Lucious is not subjected to a greater deprivation of liberty than is reasonably necessary. Therefore, the assessment is proper under 18 U.S.C. § 3583(d)(2). Additionally, because the condition is reasonably related to the nature of his offense and the need to protect the public from further crimes, its imposition is consistent with U.S.S.G. § 5D1.3(b).

For these reasons, Mr. Lucious' second objection is **DENIED** and he is required to undergo a sex offender assessment. However, the Court will also require that the assessment and all supporting testing and/or documentation be provided to Mr. Lucious' defense counsel.

## II.  Sentencing

Pursuant to *United States v. Booker*, this Court must consider the advisory United States Sentencing Guidelines as well as each of the additional factors stated in 18 U.S.C. § 3553(a) in imposing a reasonable sentence that is sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553(a). *See United States v. Booker*, 543 U.S. 220, 245 (2005). Section 3553(a) requires the Court to consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a). It also requires the Court to impose a sentence that complies with the purposes of sentencing, which include (1) retribution, (2) deterrence, (3) incapacitation, and (4) rehabilitation. *Id.* This Court carefully considered each of the Section 3553(a) factors, as well as the U.S. Sentencing Guidelines, and found that a sentence of 60 months imprisonment is appropriate in Mr. Lucious' case.

### A.  Nature and Circumstances of the Offense

At one point, eight individuals were charged in this case, which arose from a sex trafficking investigation focused on two minor victims: Jane Doe 1 and Jane Doe 2. Doc. 20. Mr. Lucious did not know Jane Doe 2; he is held accountable for his conduct involving Jane Doe 1.

> [Jane Doe 1] was a troubled 14-year-old middle-school student with a history of running away from home and placement in shelters and foster homes overseen by the New Mexico Children, Youth and Families Department (CYFD). During her time under CYFD care, Jane Doe 1 befriended Breeauna Langton, who periodically engaged in commercial sex work. As early as April 14, 2017, Jane Doe 1 became involved in commercial sex work . . . . Jane Doe 1's involvement in commercial sex work continued from at least April 14, 2017, until June 13, 2017 . . . . During this period, she was trafficked by Langton, Devin Perkins, Jason Jackson, and Keron Lucious.

Doc. 490-1 at ¶ 13.

Mr. Lucious' co-defendant, Breeauna Langton, introduced Jane Doe 1 to the commercial sex trade in the spring of 2017. *Id.* at ¶ 14 ("Jane Doe 1 did not want to return to CYFD care . . . . Langton took her in, but soon required Jane Doe 1 to engage in sex work as a condition for staying with her"). Though Ms. Langton was also a sex worker, she facilitated Jane Doe 1's prostitution by posting advertisements for Jane Doe 1 on Backpage.com, setting up "dates," and booking hotel rooms. Doc. 490-1 at ¶¶ 14–15, 17; Doc. 372 at 6–7; Doc. 372-2 at 1. Indeed, Ms. Langton's role was that of a "bottom girl." *See* Doc. 372 at 3–4 ("In addition to still engaging in commercial sex at the trafficker's behest . . . . [t]he Bottom-girl is seen as being responsible for the rest of the girls."). Ms. Langton reported during one interview that she struggled to control Jane Doe 1, and that struggle is memorialized in Facebook messages between the pair.[2] Notably, Ms. Langton's Facebook messages also indicate that she knew Jane Doe 1 was underage. *See, e.g.*, Doc. 520 at 9–10.

Ms. Langton and Jane Doe 1 soon began working with another of Mr. Lucious' co-defendants, Devin Perkins. Doc. 490-1 at ¶ 16.

> Jane Doe 1 stated Perkins "was around a lot[,]" . . . . [a]s Jane Doe 1 saw it: "I wouldn't, per se I worked for him but maybe in his eyes, he would say, yeah, she worked for me . . . because I do give him money when he asks for it and I did buy him drugs and I did buy him food and I did pay for all the hotel rooms and stuff but . . . I didn't see myself working for him." But Perkins saw her working for him, "because, like, I'd hear him on the phone. He was, like, yeah, I'm with my bit*h."

---

[2] For example, in an exchange on May 13, 2017, Jane Doe 1 "complain[s] to Langton about the distribution of sex work between them" and informs Ms. Langton that she plans to post her own ads for sex work, rather than allowing Ms. Langton to do so. Doc. 490-1 at ¶ 15; Doc. 372-6 at 9. In an exchange on May 14, 2017, Jane Doe 1 writes that Ms. Langton "need[s] to make money tonight at least 400," even after Ms. Langton has told Jane Doe 1 "I'm not gonna have you talking to me like my boss or something." Doc. 372-6 at 10. Though Jane Doe 1 was in a very precarious position, these messages indicate that she had a certain degree of independence while working in the sex trade.

*Id*. at ¶ 16.  Mr. Perkins, too, knew of Jane Doe 1's age.  *Id*. ("Jane Doe 1 also told investigators . . . . '[h]e was actually really against my age when we first met . . . because I was younger but as he found me bringing money in, he kind of was just like, I can use that.'"); *see also* Doc. 372-1 at 1.  Mr. Perkins also had sex with Jane Doe 1.  Doc. 372-5 at 2; Doc. 372-1 at 1.  Eventually, he began setting up dates for her.  Doc. 490-1 at ¶ 17.  "Devin would post the advertisements on his phone, and would wait for her to do her outcalls in an Uber."  Doc. 372 at 7 (citing Doc. 372-3 at 1).  The two came up with a scheme to "rip off" customers:

> Devin would post advertisements on Backpage using fake pictures from the Internet.  When clients would respond to the hotels that they were in, [Jane Doe 1] stated they would then rip off the clients.  She stated they would tell them they were going to call the police after the clients put the money on the table and agreed to the sexual acts.

Doc. 372-1 at 1.

Jason Jackson, another co-defendant, met Jane Doe 1 through Mr. Perkins.  Doc. 372-14 at 1 ("[Jane Doe 1] stated she first met Jackson at Devon's mother's residence.").  Mr. Jackson knew that Jane Doe 1 was underage, and, like Mr. Perkins, had sex with her.  Doc. 490-1 at ¶¶ 29, 36–39.  Mr. Jackson's cell phone was linked to two Backpage advertisements featuring Jane Doe 1, and Jane Doe 1 indicated to law enforcement that Mr. Jackson trafficked her in Santa Fe.  *Id.* at ¶¶ 30, 32, 34.

Mr. Lucious' involvement with this group "began with Langton."  Doc. 520 at 8.  "He messaged her on Facebook on May 5, 2017, where she asked him who he was, and he identified himself as 'a pimp.'  On May 6, 2017, she responded 'I'm good.'"  *Id.* (citations omitted).  In early law enforcement interviews with sex workers, Mr. Lucious is not mentioned.  *See* Doc. 372-1 at 1 (June 15, 2017 report of an interview with Jane Doe 1); Doc. 372-2 at 1 (June 21, 2017 report of an interview with Jane Doe 1); Doc. 372-3 at 1 (same); Doc. 372-4 (August 4, 2017 report of an

interview with G.A.); Doc. 372-5 at 1 (April 11, 2018 report of interview with Breeauna Langton).

However, May 14, 2017 Facebook messages between Ms. Langton and Mr. Lucious appear to

confirm Mr. Lucious' prior assertion that he was a "pimp": he asks Ms. Langton if she is "trying

to make some money," and tells her "I got some dates for you."  Doc. 490-1 at ¶ 22.  Ms. Langton

rejects the offer, telling him that it's "just so fu\*king much right now and I can't handle it."  *Id.*

When she was interviewed about these and similar messages, Ms. Langton told investigators that

Mr. Lucious (who went by "Smash Bro" on social media) was "involved with Devin as a type of

partner in forcing them to work."  Doc. 372-5 at 2.

Later Facebook messages appear to corroborate Ms. Langton's report, though they leave

much unclear about the power dynamic within the group.  For example, on  May 15, 2017 Mr.

Lucious "left a message on Mr. Perkins' Facebook asking, 'Were u get the room at . . . So, I can

tell the dates.'"  Doc. 490-1 at ¶ 24.  And between May 17 and 18, 2017, Mr. Lucious' messages

to Breeauna Langton indicate that he had arranged to profit financially from the sex workers.  *See*

*id.* at ¶ 24 (Mr. Lucious telling Ms. Langton "we need half of that if we doing this as a team," "U

keep 40 and put 40 on the table," and "after this u have to stat going half.").  Those same messages

indicate that Mr. Lucious was familiar with Jane Doe 1:

> Langton: Jane Doe 1 is asleep
> Langton: She won't get up
> Lucious: Where she at
> Langton: In bed not doing shit and Devin isn't there either I'm trying to tell her to
> get up and she won't listen
> Lucious: Well tell bro I said to make her get up

*Id.*  As the government notes, this exchange indicates that Mr. Lucious had "some control over

when Jane Doe 1 could and could not sleep."  Doc. 522 at 2.  Still, these messages do little to

clarify the exact relationship between Mr. Lucious and the sex workers: later on in the

conversation, Ms. Langton tells him "You aren't my pimp nobody is," before saying "I'll work for

you." *Id.* Then, however, when Mr. Lucious says "Im going to get yo own room," Ms. Langton

replies "For? I'm working with Jon Jon I needed your help and you weren't there." *Id.*

Relationships within the group appear to remain fluid through the end of May 2017. In

messages between Mr. Lucious and Mr. Perkins on May 24 and 25, 2017, Mr. Lucious tells Mr.

Perkins "She got my money." *Id.* at ¶ 26. Mr. Perkins replies "How it turn in to urs" and the two

have a longer conversation, with Mr. Perkins telling Mr. Lucious "u pose to take the money n give

me half," and Mr. Lucious later retorting "Wasent the plan gor yaya and Jane Doe 1 to work with

me anyway." *Id.* On May 25, 2017, Mr. Perkins messages Mr. Lucious about being angry with

one of the sex workers; Mr. Lucious asks "Can I have her." *Id.* at ¶ 28. Mr. Perkins replies "Idc

lol she doin to much bro yeah u can." *Id.* These messages appear to document a constantly

evolving relationship among the group—but one where Mr. Lucious was not necessarily "in

charge." Indeed, in a later interview, Jane Doe 1 told law enforcement that Mr. Lucious had "tried

to get her to work for him, but it never happened." Doc. 522 at 3–4.

Mr. Lucious describes his relationship to Jane Doe 1 and to his co-conspirators in the

Amended Plea Agreement:

> Between on or about April 2017 and June 2017, in Bernalillo County, in the District
> of New Mexico, I, Keron Lucious, agreed with co-conspirators Jason Jackson,
> Devin Perkins and Breaunna Langton to Commit Sex Trafficking as that crime is
> defined in 18 U.S.C. § 1591(a)(2) and (b)(2) . . . . I had a reasonable opportunity to
> observe Jane Doe 1 on more than one occasion, and agree that the Government
> could prove that Jane Doe 1 was between 14 and 18 years old in April, 2017, and
> June, 2017. As part of the venture, Jane Doe 1 would be caused to engage in
> prostitution, which is a commercial sex act. The venture secured hotel rooms for
> her to use to engage in commercial sex acts. We did rent hotel rooms for the
> purpose of others to engage in commercial sex acts, including Jane Doe 1. We also
> used Facebook accounts and cellular phones, which I now know operate in
> interstate commerce, to communicate with each other about the logistics of our sex
> trafficking activities, to include how the money would be split up.

Doc. 418 at ¶ 9. His admission is corroborated by a series of May 24, 2017 messages.

14

> On May 24, 2017, Perkins and Jackson had an exchange on Facebook, in which
> they discuss the codes for Jackson's credit card "[t]o pull the money off," and
> Jackson also states, "I'll be right there in [I'm] almost done getting the room." Then
> Lucious and Perkins discussed the money, with Lucious asking, "Ay bro whats up
> the money shit . . . I'm tryna come collect I need my money."  Perkins responded,
> saying, "He dint make it he said at 8 am it should e there."

Doc. 490-1 at ¶ 31; *see also* Doc. 100-4 at 8.  Again, however, the exact nature of the power

dynamic between Mr. Lucious, Mr. Perkins, and Mr. Jackson remains unclear.

The government points to one May 23, 2015 exchange between Mr. Lucious and Mr.

Perkins as proof that Mr. Lucious "also called the shots and made decisions among Devin Perkins

and Jason Jackson."  Doc. 522 at 3.  However, that conclusion is overstated.  The messages in

question read as follows:

> Lucious: The room is not for use to be chilling at bro
> Lucious: I got the room for the hoes we can get or own roo.
> Perkins: I'm not chilling there my bit*h there I need to collect

Doc. 490-1 at ¶ 25.  In this exchange, it is not clear whether Mr. Lucious was indeed giving

commands and "calling the shots" or whether he was merely upset and blustering.

In his sentencing memorandum, Mr. Lucious asserts that he only had limited contact with

Jane Doe 1.

> Lucious did not have a cell phone during the time he had contact with [Jane Doe
> 1].  He had to use other people's phones or computers to access his Facebook page,
> or communicate with people; as such, he was not continuously "connected" to
> social media.  A review of all the Facebook records provided by the government
> reveals that Lucious and [Jane Doe 1] were not Facebook friends and never
> communicated with each other via social media.  The only contact Lucious had with
> [Jane Doe 1], that he can specifically recall now, occurred when Lucious drove
> [Jane Doe 1], Langton and Perkins; even then, [Jane Doe 1] was always with either
> Perkins or Langton.  Lucious probably saw [Jane Doe 1] at parties attended by
> Langton and Perkins, as [Jane Doe 1] was always with one of them.  Lucious knew
> very little about [Jane Doe 1], only that she seemed to be in a relationship with
> Perkins.

Doc. 520 at 5.

**B. Sentencing Disparities**

Only Mr. Lucious, Mr. Perkins, Mr. Jackson, and Ms. Langton were significantly involved in the trafficking of Jane Doe 1. Therefore, the Court will focus on comparing Mr. Lucious' conduct and sentence to that of his three co-conspirators.[3]

Jason Jackson pled guilty to two counts of Sex Trafficking of a Minor, in violation of 18 U.S.C. §§ 1591(a) and (b)(2). He is still awaiting sentencing; however, his offense of conviction carries a mandatory minimum of ten years. Doc. 182. His Rule 11(c)(1)(C) plea agreement stipulates to a range of 132 to 180 months, while his advisory guidelines sentencing range is currently 292 to 365 months. Doc. 231 at 40. He was assessed an aggravating role adjustment. *Id.* at ¶ 94. He has entered into a separate fifteen-year plea agreement in a related state case. Doc. 368 at 2.

Devin Perkins pled guilty to a one-count Information charging him with Conspiracy to Commit Sex Trafficking of Minors, in violation of 18 U.S.C. § 1594(c). Doc. 200. He is also awaiting sentencing. His Rule 11(c)(1)(C) plea agreement stipulates to a range of 120 months and his advisory guidelines sentencing range is 324 to 405 months. Doc. 240 at 38. He was assessed an aggravating role adjustment. *Id.* at ¶ 84.

Breeauna Langton pled guilty to a one-count Information charging her with False

---

[3] There are three other defendants in this case: Camara Cherry-Amos, John Dompierre, and Chante Bickham. Mr. Dompierre is proceeding to trial. Ms. Cherry-Amos pled guilty to a one-count Information charging her with Conspiracy to Commit Sex Trafficking of a Minor, in violation of 18 U.S.C. § 1594(c). Doc. 273. Her advisory guidelines sentencing range was 188 to 235 months, and she received an aggravating role adjustment. Doc. 321 at ¶ 130. However, her Rule 11(c)(1)(C) agreement stipulated to a sentencing range of 36 to 84 months, and she was ultimately sentenced to 40 months and 12 days (time served). Doc. 273 at ¶ 10; Doc. 479 at 2. Ms. Bickham pled guilty to Transportation for Illegal Sexual Activity, in violation of 18 U.S.C. § 2421, and she has no mandatory minimum nor stipulated sentence. Doc. 368 at 3. Her Guidelines range is 108 to 120 months. *Id.* She was assessed an aggravating role adjustment and has objected to that assessment. Doc. 490-1 at ¶ 51; Doc. 292. She is awaiting sentencing.

Statement, in violation of 18 U.S.C. § 1001(a)(2).  Doc. 285.  She received a sentence of 3 days or time served.  Doc. 358.  She had no mandatory minimum, and her advisory guidelines sentencing range was 24 to 30 months.  Doc. 297 at ¶ 37.  She was not assessed an aggravating role adjustment.

After reviewing the evidence submitted, the Court concludes that Mr. Lucious was less involved—and therefore less culpable—than either Mr. Perkins or Mr. Jackson.  While those two men "would trade Jane Doe 1 back and forth," Mr. Lucious merely "attempted to recruit Jane Doe 1 to work for him; however, that never occurred."  Doc. 490-1 at ¶ 45.  While, as Mr. Lucious admits, he had a "reasonable opportunity to observe her," there is no evidence that he had actual knowledge of her age.  Doc. 418 at ¶ 9; *see also* Doc. 520 at 3.  Nor did Mr. Lucious have sex with Jane Doe 1.  For these reasons, Mr. Lucious will receive a lower sentence than Mr. Jackson and Mr. Perkins.

It is more difficult to assess Mr. Lucious' culpability as compared to Breeauna Langton. As noted above, Ms. Langton was a bottom girl—both a victim and a perpetrator.  Doc. 372 at 6. That difference is important: as the government notes, "[n]o one made [Mr. Lucious] have sex for money.  He was not subject of [sic] the control of others."  Doc. 522 at 9.  Still, Ms. Langton had actual knowledge of Jane Doe 1's age, and that Jane Doe 1 might not have become involved in sex work if it had not been for Ms. Langton.  For these reasons, the Court believes that the "gap" between Ms. Langton and Mr. Lucious' sentences should be minimized so as to avoid unwarranted sentencing disparities.

## C.  History and Characteristics

Keron Eugene Lucious is 24 years old.  Doc. 490-1 at 3.  He was born in Los Angeles, California to La'Kesha Chaney and Kenneth Lucious.  *Id.* at ¶ 77.  He moved to Albuquerque at age 12 and has six siblings.  *Id.* at ¶¶ 77, 80.  Mr. Lucious was primarily raised by his mother and

his mother's family in Albuquerque, as his father was "disengaged" from his life.  *Id.* at ¶ 80.

Consequently, his childhood was "rough" because his single mother struggled to financially

support her family.  *Id.*  For four years, Mr. Lucious lived with his grandmother, "due to [his]

mother's financial hardships."  *Id*.  In a letter to the Court, Mr. Lucious' grandmother describes

the impact of his childhood:

> I am very familiar with the circumstances he grew up in, including his absent father.
> We all know that fathers can have positive effects on children's social and
> emotional well-being . . . . unfortunately, my daughter was young when she had
> Keron and did the best she could to raise him without a father.  I believe that Keron
> was out looking for that love that only a father could give when he became involved
> with a crowd[] I consider to be bad influences.

Doc. 320 at 17.  Mr. Lucious' aunt, Erica Turner, also described Mr. Lucious' home life in a letter

to the Court, noting that he "devoted his spare time [to] his sister and brother," and took on a

caretaker role by picking up his younger siblings from school and bringing them "on outings while

his Mother would have to work."  Doc. 320 at 11.

Mr. Lucious' instability at home was mirrored by instability at school.  He transferred to

three different high schools in three years and dropped out of school after completing 9th grade.

*Id*. at ¶¶ 80, 96–97.  These frequent transfers made it difficult for the schools to address his learning

disabilities.  *See, e.g.*, Doc. 490-2 at 5 (2013 Student Profile noting that "although student was

initially compliant and meeting this social worker, his attendance has become a huge issue"); Doc.

490-2 at 45 (2015 Student Profile noting that Mr. Lucious is "[b]ehind earning credits due to poor

attendance and dropping out").  Albuquerque Public School records reflect that Mr. Lucious was

enrolled in special education "due to deficits in the areas of basic reading skills, reading

comprehension, written expression, math calculation, math reasoning, and auditory processing."

Doc. 490-1 at ¶ 98; *see also* Doc. 490-2 at 4–5, 30–31.  When Mr. Lucious was 18 years old, his

reading comprehension was at a 4th or 5th grade level.  Doc. 490-2 at 41.  Still, he had a few factors

working in his favor: one 2015 Student Profile noted that he was a "[t]alented athlete" and was "[q]uite independent," able to care for himself at home, and "contribute[] to the household." *Id.* at 39. The same assessment noted that he was "currently working" and in possession of "job retention skills like being on time, listening to instructions, [and] cooperating with peers." *Id*.

Growing up poor in Albuquerque meant that it was not easy for Mr. Lucious to keep his nose clean. He witnessed his friends get arrested and physically assaulted. Doc. 490-1 at ¶ 82. He was introduced to marijuana by friends at age 17, and his use escalated to "a few 'joints' daily" by age 19. *Id.* at ¶ 91. He experimented with cocaine at age 19 but did not develop an addiction. *Id.* at ¶ 93. Additional records indicate that Mr. Lucious used opiate pain pills for about one year, between 2013 and 2014, and that he began using alcohol during his adolescence. Doc. 328-1 at 5.

Mr. Lucious successfully completed a 30-day inpatient drug program at Turquoise Lodge in 2014. Doc. 490-1 at ¶ 94. He was 17 years old at the time that he was referred to the program; while records reflect that his referral was for "drug court," Mr. Lucious' criminal record does not reflect any juvenile convictions. *Id.* at ¶ 94; Doc. 328-1 at 5. Records indicate that "[o]verall, he did well in rehab and was no [sic] oppositional or defiant." Doc. 328-1 at 3. He received diagnoses of Marijuana Dependence, Opiate Abuse, Underage Alcohol Use, Tobacco Abuse in Remission, and Cognitive Disorder. *Id.* at 1. Rule-out diagnoses[4] were given for PTSD and "psychotic disorder versus cannabinoid-induced psychosis." *Id.* Mr. Lucious also reported to Turquoise Lodge providers that he wondered if he might have ADHD. *Id.* at 6. However, he was never diagnosed with a specific learning disability, behavioral disorder, or mental health condition other than depression. Doc. 490-1 at ¶ 90; Doc. 490-3 at 30 (documenting a diagnosis of "major depression, recurrent").

---

[4] Rule-out diagnoses are not unequivocal diagnoses; rather, they are an instruction to investigate the possibility that a patient may have a certain condition.

Despite the challenges that Mr. Lucious faced in school and at home, he was able to maintain steady employment, working as a loader at Walmart from 2017 until his arrest.  Doc. 490-1 at ¶ 100.  Mr. Lucious' employment was necessary to support his children, Air'eon (age 6) and Xy'Marion (age 5).  *See id.* at ¶¶ 85–87.

Air'eon was born to Mr. Lucious and Ms. Ashley Cooper (age 22).  *Id.* at ¶ 87.  Mr. Lucious and Ms. Cooper met in high school and had a three-year relationship before growing apart; Air'eon is in good health, enrolled in T-Ball, and doing well.  *Id.* at ¶¶ 85, 87.  Xy'Marion was born to Mr. Lucious and Ms. Meshelline Dotson (age 23).  *Id.* at ¶ 86.  Mr. Lucious and Ms. Dotson met through a friend and had a two-year relationship before growing apart.  *Id.*

Mr. Lucious has been in a relationship with Lasha Chavarria (age 23) for the past four years.  *Id.* at ¶ 85.  The couple met while Mr. Lucious was attending Manzano High School; Ms. Chavarria currently works as a delivery driver and caregiver and has been supportive of Mr. Lucious throughout the pendency of his case.  *Id.*  She wrote a letter of support to the Court, referring to Mr. Lucious as her spouse and writing that he "is a family-person and loving father who has always presented themselves with levelheadedness and grace."  Doc. 320 at 12.

Following his arrest and incarceration, Mr. Lucious began to experience more significant mental health issues.  While at Cibola County Correctional Facility, he reported "having intense anxiety and feeling paranoid."  Doc. 490-3 at 22.  At one point, he also reported "hearing voices." Doc. 362-1 at 52.  Additionally, he was diagnosed with "complicated bereavement" following the death of his younger brother, Ja'Zay, in 2019.  Doc. 490-1 at ¶ 89.

Ja'Zay was killed in a Northeast Heights apartment fire in April 2019.  *Id.* at ¶ 79.  He was ten years old.  Doc. 189 at 4.  His two sisters were also injured in the fire, inhaling enough smoke to require hospitalization.  Doc. 490-1 at ¶ 79.  The official cause of the fire is still under

investigation, and Mr. Lucious has repeatedly expressed how guilty he feels for not being able to provide emotional support for his family. *Id.* at ¶¶ 79, 82; *see also* Doc. 490-4 at 2.

While Mr. Lucious could benefit from therapy to help him work through his grief, his physical health problems appear relatively well-controlled. His current diagnoses include exercise-induced asthma, which is controlled with inhalers, and eczema, which is controlled with topical creams. Doc. 490-3 at 22; *see also* Doc. 521 at 3. He also suffers from knee pain. Doc. 490-1 at ¶ 89.

In the future, Mr. Lucious hopes to realize his long-held goal of becoming a physical therapist. *Id.* at ¶ 83. Crucially, he has secured a job with a remodeling company upon his release from custody. *Id.* at ¶ 99. He will also enjoy significant family support, as is evinced in the letters of support received by this Court. In addition to letters from Ms. Chavarria, Ms. Turner, and Ms. Stafford-Chaney, this Court received letters from Eric Turner Jr., Betty Lawson, and Yvette M. Jones, all of whom expressed that Mr. Lucious was a kind and supportive person. Doc. 320 at 13–14, 16. Mr. Lucious also wrote a letter to the Court "taking full responsibility for my role and acts." Doc. 490-4 at 1. "I was a young kid not thinking and only thinking about myself," he writes. *Id.*

### D. Deterrence

The need for specific deterrence can be evaluated by reviewing a defendant's criminal history. Notably, Mr. Lucious has no adult criminal convictions; nor could this Court find record of any juvenile adjudications. Doc. 490-1 at ¶¶ 70–71. He was arrested once, at age 20, for Shoplifting – Over $250 but not More than $500. *Id.* at ¶ 75. That incident allegedly took place at a Walmart, where the loss prevention officer advised that "subjects in a silver Honda just committed shoplifting and one of the males told the manager he was going to shoot him." *Id.* This

single arrest constitutes the entirety of Mr. Lucious' documented criminal history.  His total criminal history score is therefore zero and he is in criminal history category I.  *Id.* at ¶ 73.

In assessing the need for deterrence, this Court also takes Mr. Lucious' post-arrest history into account.  While Mr. Lucious was in pretrial custody, Cibola County Correctional Center conducted a "shakedown" of the pod where he was housed.  "During the shakedown, a homemade sharpened instrument which was approximately four inches in length was in a cell the defendant was occupying with another inmate.  The defendant denied knowledge of the weapon and was cooperative during the investigation."  Doc. 490-1 at ¶ 73.  The weapon was located under the bottom bunk, in a hole in the wall "which looked like it had been refilled with toothpaste."  Doc. 328-2 at 1.  Mr. Lucious told investigators that "he never knew nothing was in the wall," because "he never would get under the bunk to investigate the crack in the wall."  *Id*. at 2.  The Court finds Mr. Lucious' explanation credible, and will not weigh this incident heavily in his sentencing.

### E.  Just Punishment

With respect to the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to promote public safety, the instant offense was extremely serious.  Mr. Lucious' choices caused great harm to a 14-year-old girl who was pressured into sex work by others when she found herself homeless.  While Mr. Lucious was, perhaps, unaware of Jane Doe 1's background, he did know that she was having sex for money.  Instead of attempting to profit from Jane Doe 1, Mr. Lucious should have sought to help her leave sex work behind.   What he did was morally wrong.

However, Mr. Lucious has already been severely punished for his conduct.  Though he is a first-time offender, he has been in continuous custody since his arrest on April 11, 2018.  Doc. 490-1 at 1.  He was unable to attend his brother's funeral, and he has been in custody for the

duration of the COVID-19 pandemic, deprived of rehabilitative programming while his detention facility cycles in and out of lockdown.  In this way, Mr. Lucious has already been severely punished.

## F.  Appropriateness of a 60-Month Sentence

18 U.S.C. § 3553(a) requires this Court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the sentencing factors set forth in that section.  The Court has carefully considered each of those factors and ultimately believes that a sentence of 60 months best serves the factors set forth in 18 U.S.C. § 3553(a).  The Court comes to this conclusion for several reasons.

As to the nature and circumstances of the offense, Mr. Lucious was involved in a sex trafficking conspiracy which caused great harm to Jane Doe 1, and it was wrong of him to profit from her misfortune.  Still, the offense did not involve force, fraud, or coercion.  Additionally, Mr. Lucious' level of involvement in the conspiracy is mitigating.  The evidence indicates that he had relatively little contact with Jane Doe 1 as compared to his co-defendants.  Unlike Ms. Langton and Mr. Perkins, he had no actual knowledge of Jane Doe 1's age.  And unlike Mr. Perkins and Mr. Jackson, Mr. Lucious never had sex with Jane Doe 1.  Likewise, the evidence does not indicate that Mr. Lucious ever achieved unambiguous authority over Jane Doe 1: in her own words, Mr. Lucious "tried to get her to work for him, but it never happened."  Doc. 522 at 3–4.

Mr. Lucious' history and characteristics are also mitigating.  As the government points out, sex workers often have "limited options in life."  Doc. 372 at 2.  They are often socialized into believing that "participating in commercial sex is what they do to survive."  *Id*. at 5.  Mr. Lucious shares those characteristics with his victims, something that is not true of all "pimps" or traffickers. He grew up poor; his lack of education and processing difficulties would have made it

extraordinarily difficult for him to find a job which paid enough to support his family.  While it is laudable that Mr. Lucious was able to find and maintain employment at Wal-Mart, his wages fluctuated between $750 and $1,000 per month.  Doc. 490-1 at ¶ 100.  It is not difficult to understand how Mr. Lucious found himself in a financial quagmire.  Nor is it difficult to see how he learned that participating in the sex trade is what he had to do to survive, especially at such a young age.

With respect to the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment and deterrence, Mr. Lucious' actions were clearly serious.  However, this is his first conviction, and he has been punished in a way that reflects the seriousness of the offense.  In particular, he has been incarcerated for the duration of the COVID-19 pandemic, kept apart from his family in an environment with almost no rehabilitative programming.  His sentence has been harsh; in his own words, it has deterred him from future criminal conduct by showing him how difficult it is "trying to be a brother, husben [sic], son, a father and a role model from behind these wall[s]."  Doc. 490-4 at 1.  Additionally, Mr. Lucious has been unable to pursue educational or vocational training while in custody.  Such training would provide him with a legal avenue to financial stability, thereby removing his primary motive for entering the sex trafficking industry.  This lack of correctional treatment is yet another way in which Mr. Lucious' sentence has been particularly harsh, and the Court has taken the absence of programming and rehabilitative treatment into consideration when deciding on an appropriate sentence.

Finally, a sentence of 60 months is necessary to minimize the disparity between Mr. Lucious and Ms. Langton.  Some level of disparity is justified by the fact that Ms. Langton was indeed a victim who became involved in sex work at a young age.  However, the Court finds that

this disparity should be as small as possible, given that Ms. Langton played a larger role in recruiting Jane Doe 1 into the sex trafficking conspiracy.

Mr. Lucious is extremely young.  So are his children.  It may be difficult to rebuild his relationship with Air'eon and Xy'Marion in the wake of a five-year sentence.  However, the Court has confidence in Mr. Lucious.  Unlike many of the defendants that come before this Court, he has demonstrated the ability to maintain loving family relationships and to work a legitimate job.  He has faced many obstacles in life and has proved himself resilient.  For these reasons, the Court believes that Mr. Lucious will succeed on supervised release and will live up to his potential to be the brother, husband, son, father, and role model that he wishes he could be.

## CONCLUSION

For the foregoing reasons, as to Count 1 of the Superseding Information in case number 17-CR-3246-MV-6, Mr. Lucious is committed to the custody of the Bureau of Prisons for a term of 60 months.

Mr. Lucious is placed on supervised release for a term of five years.  He must comply with the mandatory and standard conditions of supervision:

Mr. Lucious must not commit another federal, state, or local crime.

Mr. Lucious must not unlawfully possess a controlled substance.

Mr. Lucious must refrain from any unlawful use of a controlled substance.  He must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

Mr. Lucious must cooperate in the collection of DNA as directed by statute.

Mr. Lucious must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state, local, or tribal sex offender registration agency in which he resides, works, is a student, or was convicted of a qualifying offense.

Mr. Lucious must make restitution in accordance with 18 U.S.C. §§ 3663, 3663A or any other statute authorizing a sentence of restitution.

Mr. Lucious must report to the probation office in the federal judicial district where he is authorized to reside within 72 hours of his release from imprisonment, unless the probation officer instructs him to report to a different probation office or within a different time frame.

After initially reporting to the probation office, he will receive instructions from the court or the probation officer about how and when he must report to the probation officer, and he must report to the probation officer as instructed.

Mr. Lucious must not knowingly leave the federal judicial district where he is authorized to reside without first getting permission from the court or the probation officer.

Mr. Lucious must answer truthfully the questions asked by his probation officer.

Mr. Lucious must live at a place approved by the probation officer. If he plans to change where he lives or anything about his living arrangements (such as the people he lives with), he must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, he must notify the probation officer within 72 hours of becoming aware of a change or expected change.

Mr. Lucious must allow the probation officer to visit him at any time at his home or elsewhere, and he must permit the probation officer to take any items prohibited by the conditions of his supervision that the probation officer observes in plain view.

Mr. Lucious must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses him from doing so. If he does not have full-time employment he must try to find full-time employment, unless the probation officer excuses him from doing so. If he plans to change where he works or anything about his work (such as his position or job responsibilities), he must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, he must notify the probation officer within 72 hours of becoming aware of a change or expected change.

Mr. Lucious must not communicate or interact with someone he knows is engaged in criminal activity. If he knows someone has been convicted of a felony, he must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

If Mr. Lucious is arrested or questioned by a law enforcement officer, he must notify the probation officer within 72 hours.

Mr. Lucious must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

Mr. Lucious must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

If the probation officer determines that Mr. Lucious poses a risk to another person (including an organization), the probation officer may, after obtaining Court approval, require him to notify that person about the risk and he must comply with that instruction. The probation officer may contact the person and confirm that Mr. Lucious has notified the person about the risk.

Mr. Lucious must follow the instructions of the probation officer related to the conditions of supervision.

Due to the nature of the offense—a conspiracy to commit sex trafficking—and the need to protect the public, Mr. Lucious must comply with the following standard and special sex offender conditions:

Mr. Lucious must undergo a sex offense-specific assessment to determine the level of risk for sexual dangerousness, recidivism, and amenability to treatment and formulate treatment recommendations if treatment is necessary. The assessment and all supporting testing and/or documentation will be provided to defense counsel for Mr. Lucious.

Mr. Lucious will waive his right of confidentiality and allow the treatment provider to release treatment records to the probation officer and sign all necessary releases to enable the probation officer to monitor his progress. The probation officer shall disclose the presentence report and/or any previous sex offender or mental health evaluations to the treatment provider.

Mr. Lucious must submit to a search of his person, property, residence, vehicles, documents, businesses, computers [as defined in 18 U.S.C. § 1030(e)(1)], and other electronic communications or data storage devices or media effects, at any time, by a probation officer with reasonable suspicion concerning a violation of a condition of probation or supervised release, or unlawful conduct by the person, in the lawful discharge of the officer's supervision functions. Mr. Lucious must inform any other

occupants that the premises may be subject to searches pursuant to this condition. Failure to submit to a search may be grounds for revocation of supervision.

Mr. Lucious will not have any direct or indirect contact or communication with the victim or his or her family, or go near or enter the premises where the victim or his or her family resides, is employed, attends school or treatment, except under circumstances approved in advance and in writing by the probation officer.

If recommended in the sex offense-specific assessment, Mr. Lucious must begin attending and participating in sex offender treatment consistent with the recommendations of the evaluation. Mr. Lucious must follow the rules and regulations of that program. The probation officer, in conjunction with the treatment provider, will supervise his participation in the program (location, modality, duration, intensity, etc.). Furthermore, Mr. Lucious must submit to clinical polygraph examinations, as directed by the probation officer and/or treatment provider.

Mr. Lucious is prohibited from viewing or possessing any material that depicts sexually explicit conduct as defined in 18 U.S.C. § 2256, including images, books, writings, drawings, video games, or videos depicting actual sexual intercourse. This also includes computer or computer-generated images or pictures, whether made or produced by electronic, mechanical, or other means. Should the sex offense-specific assessment determine this factor is not a risk, then this condition shall not be enforced.

Mr. Lucious must cooperate and comply with the United States Probation Office's Computer Restriction and Monitoring Program (CRMP): He may possess or use a computer(s) (as defined in 18 U.S.C. § 1030(e)(1)) or an internet capable device under certain conditions. This is not a prohibition on lawful computer or internet capable device use, but a restriction on the type of computer or internet capable device he may use. First, Mr. Lucious must identify to the probation officer his computer or internet capable device(s), data storage device(s), or any other electronic equipment capable of storing, retrieving, and/or accessing data that he possesses or uses. Mr. Lucious will agree to only use the computer or internet capable device(s) he has disclosed to the probation officer. Second, he must allow the installation of monitoring software/hardware on his computer or internet capable device(s) and must refrain from attempting to interfere with the operation of that software/hardware. Periodic searches shall be conducted to determine whether the monitoring software is functioning effectively after installation; and to determine whether there have been attempts to circumvent the monitoring software after installation. Mr. Lucious understands that the software will record all activity on his computer or internet capable device(s), and he shall inform any other users that said computer or internet capable device(s) are subject to monitoring. A computer or internet capable device that is not able to be effectively monitored will not be approved for use. Third, Mr. Lucious must disclose any username or identification(s) and password(s) for all computer or internet capable devices.

Fourth, he must submit to the probation officer, upon request, any cellular or telephone/internet service provider billing records or receipts, to verify that he is not utilizing services that are prohibited.

The following special conditions will also be imposed based on Mr. Lucious' history of drug use

and to ensure that he receives the appropriate level of treatment to achieve and maintain sobriety:

Mr. Lucious must participate in an outpatient substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise his participation in the program (provider, location, modality, duration, intensity, etc.).

Mr. Lucious shall waive his right of confidentiality and allow the treatment provider to release treatment records to the probation officer and sign all necessary releases to enable the probation officer to monitor his progress. The probation officer may disclose the presentence report, any previous substance abuse evaluations and/or other pertinent treatment records to the treatment provider.

Mr. Lucious must submit to substance abuse testing to determine if he has used a prohibited substance. Testing shall not exceed more than 60 test(s) per year. Testing may include urine testing, the wearing of a sweat patch, and/or any form of prohibited substance screening or testing. He must not attempt to obstruct or tamper with the substance abuse testing methods.

Mr. Lucious must not use or possess alcohol. He may be required to submit to alcohol testing that may include urine testing, a remote alcohol testing system, and/or an alcohol monitoring technology program to determine if he has used alcohol. Testing shall not exceed more than 4 test(s) per day. He must not attempt to obstruct or tamper with the testing methods.

Mr. Lucious must not knowingly purchase, possess, distribute, administer, or otherwise use any psychoactive substances (e.g., synthetic cannabinoids, synthetic cathinones, etc.) that impair his physical or mental functioning, whether or not intended for human consumption.

The following special conditions will also be imposed based on Mr. Lucious' recent diagnoses of

major depression and complicated bereavement, and to ensure that he receives an appropriate level

of care:

Mr. Lucious must participate in an outpatient mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise his participation in the program.

29

Mr. Lucious shall waive his right of confidentiality and allow the treatment provider to release treatment records to the probation officer and sign all necessary releases to enable the probation officer to monitor his progress. The probation officer shall disclose the presentence report, any previous mental health evaluations and/or other pertinent treatment records to the treatment provider.

The following special conditions will also be imposed based on the nature of the underlying offense, a conspiracy which caused harm to Jane Doe 1:

Mr. Lucious must not communicate, or otherwise interact, with codefendants or coconspirators without the prior approval of his probation officer.

Mr. Lucious must not communicate, or otherwise interact, with the victim, either directly or through someone else without prior approval of his probation officer.

The following special condition will be imposed due to Mr. Lucious' lack of education and the need to provide him with a future career path and financial stability:

Mr. Lucious must participate in an educational or vocational services program and follow the rules and regulations of that program. Specifically, Mr. Lucious must participate in a literacy program and work towards obtaining his GED or high school diploma. The probation officer will approve the program (agency, location, frequency of participation, etc.) and supervise his level of participation. Mr. Lucious must work with his probation officer to choose a vocation and shall advise the Court of his chosen vocation via letter.

Mr. Lucious must participate in a financial literacy program while on supervised release.

Mr. Lucious must open a bank account while on supervised release. He must provide monthly accountings of his income and expenses to his probation officer, and he must work with his probation officer to establish a budget.

The following special condition will also be imposed to ensure Mr. Lucious has a stable residence upon his release from custody:

Mr. Lucious must reside in a residential reentry center for a term of (up to) 6 months. He must follow the rules and regulations of the center.

The Court finds the Mandatory Restitution Act of 1996 is applicable in this case; however, no claim for restitution has been made by the victim in this case. The Court will therefore leave the

issue of restitution open for 90 days following Mr. Lucious' sentencing.  18 U.S.C. § 3664(d)(5).  If a motion for restitution is not filed before that deadline, no restitution shall be ordered.

Based on Mr. Lucious' lack of financial resources, the Court will not impose a fine.  In lieu of all or a portion of the fine, the Court considered alternative sanctions, such as community service, placement at a residential reentry center, and location monitoring, and concludes the total combined sanction without a fine or alternative is sufficiently punitive.

Mr. Lucious must pay a special assessment of $100, which is due during the period of his supervision.

Mr. Lucious is subject to the provisions of the Justice for Victims of Trafficking Act of 2015, which requires the Court to assess an amount of $5,000 on any non-indigent person or entity convicted of an offense under 18 U.S.C. Chapters 77, 109A, 110, 117; or Section 274 of the Immigration and Nationality Act (8 U.S.C. § 1324). The Court finds that Mr. Lucious is indigent and will not be required to pay the $5,000 assessment.

The Court finds that pursuant to the Plea Agreement, Mr. Lucious waives the right to appeal the final sentence imposed by this Court, under 18 U.S.C. § 3742(a).

**IT IS SO ORDERED** that the Court sentences Mr. Lucious to a term of imprisonment of 60 months, followed by a five-year term of supervised release.

ENTERED this 27th day of January 2022.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

31